IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



| | | |
|---|---|---|
| MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH,<br><br>Plaintiff,<br><br>v.<br><br>BP AMERICA PRODUCTION COMPANY,<br><br>Defendant. | § § § § § § § § § § § § | 2:20-CV-34-Z |

## MEMORANDUM OPINION AND ORDER
## DENYING PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

This matter comes before the Court on two filings: (1) Plaintiff's Original Complaint for Declaratory Judgment and Application for Temporary Restraining Order and Preliminary Injunction, filed February 13, 2020 (ECF No. 1) ("Complaint"); and (2) Plaintiff's Brief in Support of Motion for Preliminary Injunction, filed February 20, 2020 (ECF No. 9) ("Motion"). In both filings, Plaintiff moves the Court to preliminarily enjoin Defendant from assigning to Courson Oil & Gas, Inc. any of Defendant's interests in an oil and gas lease. *See* Complaint ¶¶ 23-40, at 8-11. On March 2, 2020, the Court held a hearing on the pending Motion, wherein both parties clarified the underlying facts, systematically set forth their competing claims, and capably articulated the relevant legal standards — more precisely, the *absence* of relevant legal standards. Based on the papers, the hearing, and its independent review of relevant mineral law, the Court herewith DENIES Plaintiff's request for a preliminary injunction for the reasons set forth below.

1

BACKGROUND

After the Civil War, two Army veterans turned surveyors built a ranchland empire across the Panhandle of Texas.[1] At its peak, the empire enclosed contiguous ranchland roughly half the size of Rhode Island.[2]

Five decades later, another Army veteran — World War I tanker Charles Storch Lips — purchased sections of said ranchland empire in Roberts County and neighboring Ochiltree County to start a ranch of his own.[3] He and his wife Barbara Lips jointly worked the land and extended their ranch for the next twenty-one years until Charles succumbed to Parkinson's disease in 1970.[4] Barbara soldiered on alone and expanded the family businesses for nearly another quarter century, becoming one of the largest landowners in the Panhandle.

For decades, rich prairie grass fed Barbara Lips's cattle herds and therewith the growth of her burgeoning business. But one oil and gas company — Alpar Resources, Inc. ("Alpar") — theorized that even *greater* riches might lie deep beneath the grass. In 1994, Alpar inked a hydrocarbon exploration and production agreement with Lips. *See* Oil and Gas Lease Between Barbara Woodrow Lips and Alpar Resources, Inc. ¶¶ 1-3, at 1-10, filed February 13, 2020 (ECF No. 1-1) ("Alpar Lease").

In general, the Alpar Lease mimicked boilerplate language appearing in oil and gas templates throughout West Texas: survey identifications, *check*; royalties schedule, *check*; delay rentals, bonuses, and cessation of operations timelines, *check, check, check*. But in the closing

---

[1] *See* Texas State Historical Association, Jot Gunter, *in Handbook of Texas Online*, http://www.tshaonline.org/handbook/online/articles/fgu06 (Feb. 13, 2020) (last visited Mar. 20, 2020) (reporting history of the landholdings in which the section of land at issue in this case is located).
[2] *Id.*
[3] *See* 5 William E. Connelley, Biography of Hon. George Storch, *A Standard History of Kansas and Kansans* (1918) (reporting on Charles Storch Lips as part of biography on his prominent grandfather).
[4] *See* Mayo Clinic, Cultivating Hope: Barbara Woodward Lips, https://plannedgiving.mayoclinic.org/benefactor-stories/cultivating-hope (last visited Mar. 20, 2020); *Mayo Benefactor Once Was Poor*, ROCHESTER [MN] POST-BULLETIN, Mar. 2, 1996.

2

paragraphs, the Alpar Lease deviated from boilerplate to protect Lips's surface rights more particularly and expansively than the default language appearing in most standard oil and gas leases.[5] Relevant here, Paragraph 7 reserved to Lips an absolute veto over any assignments of Alpar's lessee interest in the overlying land or underlying minerals:

> The right and obligations of Lessee hereunder are not assignable or transferable in any respect as to segregated portions of the leased premises or as to only certain depths under the leased premises.

*See* Alpar Lease ¶ 7, at 15 ("Consent-to-Assign Clause").

Subsequent lessors and lessees succeeded to the Alpar Lease before its primary term expired. In 1995, Barbara Lips passed and devised ownership of the leased landholdings to the endowment arm of Mayo Clinic — the Plaintiff in the present case. In 1996, Alpar assigned to the Amoco Production Company ("Amoco") specified acreage from the Alpar Lease as part of a farmout agreement.[6] *See* Farmout and Seismic Option Agreement 24, *in* Amended and Corrected Exhibits in Support of BP America Production Company's Response to Application for Preliminary Injunction ("Response Exhibits"), filed March 2, 2020 (ECF No. 14-1) ("Farmout Agreement"). That acreage included survey Section 157 in Roberts County and other nearby and adjoining tracts of land. *See id.*

---

[5] *See, e.g.*, Alpar Lease ¶ 9, at 15-18 (listing various restrictions).

[6] The assignment originally was conditioned on Amoco drilling a productive oil well on the property, whereafter it would take an undivided 100% lease interest in the proration unit in which the productive well was located. *See* Exhibit A to Farmout Agreement at 33. The Farmout Lease exempted from the transfer of lease interest and reserved unto Alpar an overriding royalty interest of five percent of all oil, gas, and condensate produced. Farmout Agreement ¶ 3, at 25. Alpar could convert this overriding royalty interest to a 25% working interest in the affected proration unit after Amoco had recovered all the actual costs it had incurred to drill, complete, equip, produce, and operate the well. *Id.* ¶ 3, at 25-28. Neither the parties' filings nor their presentations during the motion hearing address whether Alpar ever exercised this option, but neither party contests that Amoco eventually obtained a 100% undivided interest in Section 157 of the leased land. An overriding royalty interest is "ownership in a percentage of production or production revenues, free of the cost of production, created by the lessee, company, and/or working interest owner by the lessee, company, and/or working interest owner out of revenue from [a] well." Schlumberger Oilfield Glossary. A farmout is a "contractual agreement with an owner who holds a working interest in an oil and gas lease to assign all or part of that interest to another party in exchange for fulfilling contractually specified conditions." *Id.* (last visited Mar. 20, 2020)

In 1996, Amoco entered into an operating agreement[7] with Courson Oil & Gas, Inc. ("Courson") to sink more wells into Section 157 and to lead assorted other operational tasks. *See* Operating Agreement Between Amoco Production Company and Courson Oil & Gas, Inc. at 1, *in* Response Exhibits at 36, filed March 2, 2020 (ECF No. 14-1) ("Operating Agreement"). Paragraph F of the Operating Agreement provided Courson with a preferential right to purchase[8] Section 157 should Amoco at any time desire to sell all or any part of its lease interest:

> Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer.
>
> The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties.

*See* Operating Agreement, art. VIII ¶ F, at 12, *in* Response Exhibits at 37 ("Preferential-Right-to-Purchase Clause").

The rights and obligations contained in the Alpar Lease also shifted during the lease's primary term, being amended three times within four years. Relevant here, the Third Amendment, which was finalized by Plaintiff and Alpar on May 29, 1998, removed and replaced the original

---

[7] An operating agreement, sometimes also called a "joint operating agreement" or "JOA," is an "agreement between parties who own a working interest in a well that sets out responsibilities and duties of the operator and nonoperators, including drilling the test well and subsequent wells and sharing of expenses and accounting methods." Schlumberger Oilfield Glossary *supra* note 6. For recognition of and further discussion about how the Texas courts understand and interpret operating agreements, see *Tawes v. Barnes,* 340 S.W.3d 419 (Tex. 2011) and *EOG Resource, Inc. v. Killam Oil Co., Ltd.,* 239 S.W.3d 293 (Tex. App. San Antonio 2007).

[8] A preferential right to purchase is the "right that non-selling participating parties have in a lease, well or unit to proportionately acquire the interest that a participating party proposes to sell to a third party." Schlumberger Oilfield Glossary *supra* note 6.

4

Consent-to-Assign Clause with substitute language that is facially *less* restrictive and arguably constitutes a *lesser* restraint on alienation:

> The rights and obligations of the Lessee hereunder are not assignable or transferable in any respect by it, except upon the written approval of Bank One Trust Company, N.A., as Agent, or any successor Agent, *which approval shall not be unreasonably withheld.*

Third Amendment to Oil and Gas Lease at 1, filed February 13, 2020 (ECF No. 1-1) ("Third Amendment") (emphasis added).

After the ink dried on the Third Amendment, the pace of amendments slowed down and the Alpar Lease entered into a secondary term and a new millennium. For the next two decades, wells were drilled, minerals were developed, and royalties were paid. For a while, the Alpar Lease moved forward at a steady pace, without drastic interruption, mimicking the movement of the cattle, the horses, and the horsehead pumpjacks in the Panhandle.

But in September 2019, the Defendant finalized a Purchase and Sale Agreement ("PSA") with Latigo Petroleum, LLC ("Latigo") conveying its investment properties in the Panhandle — including Section 157. *See* Letter from BP America Production Company to Courson Oil & Gas, Inc. (dated Oct. 24, 2019), *in* Alpar Lease at 23. Pursuant to the Operating Agreement it had signed with Courson in 1996, Defendant offered Courson a preferential right to purchase its lease interest in Section 157. *See id.* Courson accepted this offer in November 2019. *See* Letter from Courson Oil & Gas, Inc. to BP America Production Company (Nov. 5, 2019), *in* Alpar Lease at 28.

Plaintiff strenuously opposed the assignment of Section 157 lease rights to Courson because of Plaintiff's past business dealings and litigation with Courson. As successor lessor to the Alpar Lease, Plaintiff advised Defendant that it would exercise its right to *withhold* consent pursuant to the Third Amendment version of the Consent-to-Assign Clause. *See* Complaint ¶ 17,

at 5; Alpar Lease at 29-32. In response, Defendant averred that Plaintiff's consent was not legally required to consummate the PSA. On January 20, 2020, Defendant notified Plaintiff that Courson had elected to acquire Defendant's exploration and development rights in Section 157. *See* Letter from BP America Production Company to Mayo Foundation for Medical Research and Education, (January 20, 2020), *in* Alpar Lease at 34 ("Letter").

Since the Letter, Plaintiff and Defendant have litigated their disagreements in this Court. Plaintiff's Complaint, filed less than a month after Defendant sent the Letter, took the form of three separate pleadings: (1) complaint, (2) motion for a temporary restraining order, and (3) motion for a preliminary injunction. *See* ECF No. 1. The very next day, this Court denied the motion for a temporary restraining order in a Memorandum Opinion and Order, but stated that the denial was without prejudice to Plaintiff's ability to move for a preliminary injunction. *See* ECF No. 6 & 7. One business day later, Plaintiff filed the Motion for PI and requested an emergency hearing on the preliminary injunction issue. *See* ECF No. 8 & 9. The following week, this Court granted the request and scheduled a hearing for the first opening in the Court's calendar on the morning of March 2, 2020. *See* ECF No. 10. Three days later, Defendant submitted its Response, followed by Plaintiff's Reply, which was filed on the morning of the PI hearing. *See* ECF No.12-13. Because of the geographical and leasehold complexity of the facts underlying this case, the Court ordered the parties to submit an agreed map of Section 157 reflecting the relevant leases, tracts, pipelines, operators, and wellheads. *See* ECF No. 18. The parties complied with the Court's deadline by filing *multiple* maps — but could not reach *agreement* on a particular map. *See* ECF No. 20. In total, the parties have populated the docket sheet with twenty entries in roughly three weeks.

## LEGAL STANDARD

Even though the District Court has discretionary power to issue a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, the Supreme Court of the United States admonishes the courts to invoke this power sparingly and only in extraordinary circumstances. *Compare Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017), *with Sampson v. Murray*, 415 U.S. 61 (1974). Absent extenuating circumstances, no District Court should issue a preliminary injunction unless one is necessary to protect the plaintiff from irreparable injury or to preserve the court's power to render a meaningful decision after a trial on the merits. *See Stacey G., by William and Jane G. v. Pasadena Independent School Dist.*, 695 F.2d 949, 955 (5th Cir. 1983); *Meis v. Sanitas Service Corp.*, 511 F.2d 655, 656 (5th Cir. 1975); *Hollon v. Mathis Independent School Dist.*, 491 F.2d 92 (5th Cir. 1974).

Even within this limited locus of action, the District Court should grant preliminary injunctions only when the plaintiff establishes the following: (1) it is substantially likely to succeed on the merits of the underlying case; (2) it is substantially likely to suffer irreparable harm if the injunction is not granted; (3) the threatened injury outweighs any harm that the injunction may occasion for the defendant; and (4) the injunction will not undermine the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (*"Winter"*); *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). These four factors are conjunctive — *i.e.*, the plaintiff must carry the burden as to all four factors before a preliminary injunction may be considered. *Voting for America, Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013); *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195-96 (5th Cir. 2013).

## ANALYSIS

Texas state courts long have recognized that a court may grant a preliminary injunction, *in a proper case*, to protect the rights of a party to an oil and gas lease. *See Stanolind Oil & Gas Co. Wimberley*, 181 S.W.2d 942 (Tex. Civ. App. El Paso 1944). Yet, as both the Plaintiff and the Defendant conceded at the PI hearing, this Court must decide multiples issues of first impression before deciding whether *this* case is such a proper case. When reviewing the law, facts, and arguments in this case, the Court has applied the *Winter* criteria as a prism to split the preliminary injunction analysis into four testable elements.

When, as here, the Plaintiff must satisfy four elements in order to succeed on a motion, failure to succeed on *any* element automatically results in failure to succeed when *all* the elements are considered. *See Voting for America, Inc. v. Steen*, 732 F.3d at 386.[9] Therefore, if the Plaintiff fails to satisfy even one of *Winter*'s preliminary injunction elements, the Court may logically conclude that Plaintiff fails to meet its burden — regardless of success on the other elements. After considering Plaintiff's Motion for PI and all Exhibits thereto, and the convoluted succession of interests on both sides of the Alpar Lease, the Court FINDS that Plaintiff on the current record is not substantially likely to succeed on the merits of the case. The Court secondly FINDS that Plaintiff is not likely to suffer irreparable harm in the absence of a preliminary injunction. Because these two fatal blows by themselves defeat the Motion for PI and because neither party briefed the third or fourth *Winter* element for the Court, the Court hereby invokes its discretion under Rule 65 of the Federal Rules of Civil Procedure to DENY Plaintiff's Motion for PI.

---

[9] Incidentally, this result holds true mathematically even if one of the elements contains an unknown or non-zero value, because any number multiplied by zero is equal to zero. Expressed in the language of symbolic logic, the conclusion becomes $\prod_1^{n-1} p_n = 0 \Rightarrow \prod_1^n p_n = 0 \; \forall_p \in \mathbb{R}$ , where *p* is the probability of success on factor *n*. In other words: If the product of a series of probabilities is equal to zero — as would be the case if any of the probabilities is zero — then it is logically implied and logically necessary that multiplying by an additional probability will result in a product of zero for any probability that falls into a set of all the real numbers.

### 1. Substantial Likelihood of Success on the Merits

As the parties presciently acknowledged during the PI hearing, Plaintiff's likelihood of success on the merits turns on two questions about the Alpar Lease's Consent-to-Assign Clause, as modified by the Third Amendment.

First, given the longstanding and strong presumption in Texas law against restraints on alienation of property[10] and the default presumption that an oil and gas Lessee may freely assign its interests,[11] should the Court lend any weight to the paragraph and recognize as valid Plaintiff's contractual right to withhold consent to assign?

Second, if Plaintiff validly may withhold consent to assign, is such a refusal to consent "reasonable" in the present case vis-à-vis Courson? In other words, is it reasonable for Plaintiff to withhold consent to assign Defendant's interest in Section 157 to an established and financially secure oil and gas operator? In the remainder of this subsection, the Court tackles these questions of first impression by assembling and analyzing the relevant case law, restatements of the law, and prominent treatises. Evaluating the overall picture that emerges therefrom, the Court concludes that Plaintiff is likely to succeed in proving that the consent-to-assign paragraph is *valid*, but that Plaintiff is likely to *fail* to prove that its refusal to consent to assign Section 157 to Courson is "reasonable." Because Plaintiff would need to succeed in proving both factors to satisfy the first element of preliminary injunction analysis under *Winter*, the Court consequently concludes that Plaintiff is not substantially likely to succeed in proving the first element.

---

[10] *See Carder v. McDermett*, 12 Tex. 546, 549 (1854) ("It will be admitted as a principle not to be questioned, that the power to alienate property is a necessary consequence of ownership, and is founded on natural right.")
[11] *See, e.g.*, 1 *Ernest E. Smith & Jacqueline Lang Weaver, Texas Law of Oil and Gas* § 4.9 [B] (Lexis 2015).

9

### A. Is the Consent-to-Assign Restraint on Alienation valid?

Under Texas choice-of-law principles, the Court should apply Texas law to its construction of the Alpar Lease because Section 157 is situated entirely within the State of Texas. *See Blackmon v. XTO Energy*, 276 S.W.3d 600 (Tex. App. Waco 2008). Texas law recognizes that oil and gas leases are chimeras of contract and property law, but also unmistakably sets forth that these leases are "leases" in name only. Despite their contractual form, oil and gas leases under Texas law convey a fee simple determinable interest in the minerals that are leased. As the Texas Supreme Court summarized this position in 2003:

> [I]t has long been recognized that an oil and gas lease is not a "lease" in the traditional sense of a lease of the surface of real property. In a typical oil or gas lease, the lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee. Consequently, the lessee/grantee acquires ownership of all the minerals in place that the lessor/grantor owned and purported to lease, subject to the possibility of reverter in the lessor/grantor. The lessee's/grantee's interest is "determinable" because it may terminate and revert entirely to the lessor/grantor upon the occurrence of events that the lease specifies will cause termination of the estate.

*Natural Gas Pipeline Company of America v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003). This taxonomic classification is not purely academic, as Texas gives parties to a contract wide discretion to impose restraints on alienation of contract rights — but much narrower discretion to impose similar restraints on *property* rights. Because Texas considers oil and gas leases to convey the latter, the Court should start with a default but rebuttable presumption against the validity of restraints on alienation in the Alpar Lease and its amendments. *See Robbins v. HNG Oil Co.*, 878 S.W.2d 351, 363 (Tex. App. – Beaumont 1994) ("[I]t is hornbook law and an axiomatic rule that restraints on alienation are squarely contrary to public policy and are forbidden and disallowed.")

When determining which facts or characteristics may suffice to *rebut* this presumption of invalidity, this Court would ideally rely on a detailed and developed body of Texas case law. Unfortunately, the legal landscape on this question is less populated than the Panhandle tract at issue in this case. As early as 1990, treatise writers identified this relevant "gap" in Texas law, noting that "there are surprisingly few decisions addressing the validity of transfer clauses in oil and gas and other mineral leases," and describing the question as a purely "theoretical one." 4 EUGENE KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS 307-08 (1990). Despite three ensuing decades of unprecedented oil and gas expansion in the United States generally and Texas specifically, this Court ascertains that no Texas court has squarely and decisively addressed the pending question of *validity*.

The aforementioned gap in state jurisprudence notwithstanding, Texas courts *have* pressed into service the American Law Institute's Restatements of Property when construing oil and gas leases. *See Navasota Resources, L.P. v. First Source Texas, Inc.*, 249 S.W.3d 526, 537 (Tex. Ct. App. Waco 2008) (listing cases). This Court agrees with the Texas methodology and thereby adopts the taxonomy of the Restatement (First) of Property ("First Restatement"), which divides restraints on alienation into three categories: (1) promissory restraints[12]; (2) disabling restraints[13]; and (3) forfeiture restraints.[14] *See* RESTATEMENT (FIRST) OF PROPERTY § 404. The Court further adopts the First Restatement's assessment of promissory restraints, which are deemed valid if they permit alienation to at least *some* possible alienees. *See* RESTATEMENT (FIRST) OF PROPERTY § 406

---

[12] A promissory restraint on alienation of property is "an attempt by an otherwise effective conveyance or contract to cause a later conveyance to impose contractual liability on the one who makes the later conveyance when such liability results from a breach of an agreement not to convey." RESTATEMENT (FIRST) OF PROPERTY § 404 (1)(b).

[13] A disabling restraint on alienation of property is an attempt by an otherwise effective conveyance or contract to cause a later conveyance to be void." RESTATEMENT (FIRST) OF PROPERTY § 404 (1)(a).

[14] A forfeiture restraint on alienation of property is "an attempt by an otherwise effective conveyance or contract to cause a later conveyance to terminate or subject to termination all or a part of the property interest conveyed." RESTATEMENT (FIRST) OF PROPERTY § 404 (1)(c).

(a) - (c). The Court thus must determine whether Paragraph 7 of the Alpar Lease as amended contains a promissory restraint that seeks to veto assignment to one but not *all* possible assignees.

### *1. Paragraph 7 of the Alpar Lease as Amended Contains a Promissory Restraint*

In recent years, the Texas Supreme Court has provided definitive guidance on the rules of construction applied to oil and gas leases. First, this Court must look to the plain meaning of the language used by the parties to ascertain whether the language is unambiguous. *See Barrow-Shaver Resources Co. v. Carrizo Oil & Gas, Inc.,* 590 S.W.3d 471, 479 (Tex. 2019). If the plain meaning of the language is ambiguous in isolation, the Court should apply the canon of construction against surplusage and should attempt to find an interpretation of the provision that would harmonize it with the remainder of the lease. *See Kachina Pipeline Co., Inc. v. Lillis,* 471 S.W.3d 445, 449 (Tex. 2015); *Plains Exploration & Prod. Co. v. Torch Energy Advisors, Inc.,* 473 S.W.3d 296, 305 (Tex. 2015). If the language *still* is ambiguous, the Court should ascend to the final level of abstraction to investigate the parties' intent in drafting the language. *See Murphy Expl. & Prod. Co.—USA v. Adams,* 560 S.W.3d 105, 110 (Tex. 2018); *BP America Prod. Co. v. Red Deer Resources, LLC,* 526 S.W.3d 389, 394 (Tex. 2017). This Court may not rely on the further abstraction of industry usage or industry custom to add a nonessential term to the lease language. *See Barrow-Shaver Resources Co.,* 590 S.W.3d at 486-87; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 221 (1981).

As noted above, the current amended language of Paragraph 7 reads as follows: "The rights and obligations of the Lessee hereunder are not assignable or transferable in any respect by it, except upon . . . written approval . . . which approval shall not be unreasonably withheld." Third Amendment at 1. Because this language does not plainly reflect the second and third categories contemplated by the First Restatement — disabling (voiding) restraint; forfeiture restraint — this

12

Court hereby FINDS that Paragraph 7 unambiguously falls in the first category: a promissory restraint. (Incidentally, the parties at the PI hearing conceded that Paragraph 7 is unambiguous except for the last five words: "shall not be unreasonably withheld.").

The Court would reach the same taxonomic conclusion even if the language of Paragraph 7 were not unambiguous. Applying the canon of construction against surplusage, the Court notes that Paragraph 7 does not duplicate any other provision in the Alpar Lease as amended and that every word in the paragraph therefore must be given meaning. Seeking to harmonize Paragraph 7 with the remainder of the Alpar Lease as amended, the Court notes that the Alpar Lease retains other lessor restraints that Barbara Lips first negotiated in 1994. Comparing Paragraph 7 in the original Alpar Lease with the Paragraph 7 substituted in the Third Amendment reflects that the parties intended a restraint on alienation that would neither void nor terminate the lease.[15]

### 2. *Paragraph 7 of the Alpar Lease as Amended permits Alienation to Some Alienees*

As noted above, not all promissory restraints on alienation in an oil and gas lease are valid. The restraint must not be *absolute*. *Cf.* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 3.4 cmt. d.[16] For example, the Consent-to-Assign Clause in the original Alpar Lease, wherein Barbara Lips stated that the "right and obligations of Lessee hereunder are not assignable or transferable in any respect," likely would not satisfy the requirement that the restraint on alienation not be

---

[15] The Court here notes that Defendant suggested to the Court in its Response and at the motion hearing that it should be relevant to the Court's analysis that the Texas oil and gas industry distinguishes "hard consents" — which actually require a lessor's consent — from "soft consents" — which only require the lessee to notice the lessor of the lessee's intent to assign. Although the Court has found some evidence of such terms and distinctions in industry usage, *see, e.g.*, Mitchell E. Ayer & David Cias, *Consent Provisions in Oil and Gas Lease*, 34th Ann. TXCLE Advanced Oil, Gas & Energy Res. L. 19.I (2016), the Court here follows the admonition of the Texas Supreme Court in not giving any weight to industry usage that would effectively add a new term to Paragraph 7 of the Alpar Lease as amended. The Court therefore need not evaluate Defendant's argument on this point for the purposes of deciding the Motion for PI.
[16] As a general matter, the Third Restatement excludes mineral law from its discussion of servitudes. *See* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 1.1. However, the authors of multiple oil and gas treatises and leading law review articles argue that one can import the Third Restatement's view on the specific point in this comment into discussions about oil and gas law. *See, e.g.*, T. Ray Guy & Jason E. Wright, *The Enforceability of Consent-to-Assign Provisions in Texas Oil and Gas Leases*, 71 SMU L. Rev. 477, 487 (2018).

absolute. Alpar Lease ¶ 7, at 15. Here, the Third Amendment renders Paragraph 7 less absolute by expressly stating that consent "shall not be unreasonably withheld." Third Amendment at 1. By prohibiting "unreasonable" refusals to consent, the Third Amendment salvages the Alpar Lease's promissory restraint on alienation from invalidity pursuant to the standards set forth in the First and Third Restatements.

### B. Is Plaintiff's Failure to Consent to Assignment to Courson Reasonable?

If the Texas jurisprudence on the first question of *validity* is sparsely populated, the Texas jurisprudence on the second question of *reasonableness* is absolutely barren. To date, no Texas court has published an opinion delineating or discussing the relevant "reasonableness" factors in a case construing a consent-to-assign clause.[17] *See* Blake A. Watson, *Do I Have to Be Reasonable?: The Right to Arbitrarily Restrict Transfer of Occupancy and Mineral Leases*, 47 Cap. U. L. Rev. 27 (2019).

Consequently, this Court will refer to the jurisprudence of other states, the American Law Institute restatements, oil and gas treatises, and leading law review articles to ascertain the relevant factors in assessing "reasonableness" in a consent-to-assign context. Collectively, the aforementioned sources advise that this Court should consider the following factors when determining whether it is "reasonable" for a lessor to refuse to consent to the assignment of an oil and gas lease:

---

[17] In its Response, Defendant directs the Court to a case from the United States Court of Appeals for the Fifth Circuit that at first glance appears to be directly on point. *See* Response at 5 (quoting *B.M.B. Corp. v. McMahan's Valley Stores*, 869 F.2d 865, 869 (5th Cir. 1989)). However, this case is not as illuminating for the fact pattern in this case as Defendant believes it to be because it applies to consent-to-assign clauses in *landlord-tenant* leases instead of *oil and gas* leases. Although academic authors are slowly warming to the idea of directly applying rules governing the former to the latter, the First and Third Restatements of Property still draw a sharp distinction between the two bodies of law. The Court therefore does consider the *B.M.B. Corp.* in an analogical sense but not as the prevailing authority that Defendant seems to suggest it is.

- assignee's solvency and track record on making timely royalty payments[18]
- assignee's industry reputation for honesty and reliability[19]
- assignee's prior working relationship with lessor[20]
- assignee's capacity to operate the leasehold in an efficient manner[21]
- whether assignee is a "lease flipper" that will not actively develop the property[22]
- whether assignee would increase the number of non-cost bearing interests on the property, such as overriding royalties and production payments[23]

Finally, and importantly given the fact pattern in this case, at least one pair of commentators has discerned that a lessor may "reasonably" withhold consent if the prospective assignee is a *competitor* in the field. *See* Bruce E. Cryder & R. Clay Larkin, *Consent Provisions in Natural Resources Agreements,* 30 Energy & Min. L. Inst. 3, 95-96 (2009).

Based on the facts submitted to the Court through briefing and argument at the PI hearing, the Court does not ascertain that Plaintiff's refusal to consent to the Section 157 lease assignment to Courson is "reasonable" under the aforementioned factors. First, Plaintiff has presented no evidence that Courson is insolvent or has a bad track record of making timely royalty payments to lessors. Second, at this preliminary injunction phase, Plaintiff has not identified any material or legally cognizable malfeasance, malpractice, or malevolence by Courson that undermines its

---

[18] *See* Bruce E. Cryder & R. Clay Larkin, *Consent Provisions in Natural Resources Agreements,* 30 Energy & Min. L. Inst. 3, 95-96 (2009); *cf. Torgerson-Forstrom H.I. of Willmar, Inc. v. Olmsted Fed. Sav. & Loan Ass'n,* 339 N.W.2d 901, 904 (Minn. 1983); RESTATEMENT (SECOND) OF PROP.: LANDLORD & TENANT § 15.2(2) cmt. a.

[19] *See* Blake A. Watson, *The Right to Limit or Prohibit Mineral Lease Transfers,* 34-FEB Prob. & Prop. 46 (2020); *Flanagan v. Access Midstream Partners, L.P.,* No. 17-CV-315-GKF-JFJ, 2017 WL 4324535, at *1 (N.D. Okla. Sept. 9, 2017).

[20] *See* 4 EUGENE KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS § 51.2 (1990).

[21] *See* Benjamin Robertson et al., *Consent to Assignment Provisions in Texas Oil and Gas Leases: Drafting Solutions to Negotiation Impasse,* 48 Tex. Tech. L. Rev. 335, 347 (2016); Luke Meier & Rory Ryan, *The Validity of Restraints on Alienation in an Oil and Gas Lease,* 64 Buff. L. Rev. 305, 335 (2015-16); *SEECO, Inc. v. Hales,* 22 S.W.3d 157, 172-73 (Ark. 2000).

[22] Caleb A. Fielder, *Blood and Oil: Exploring Possible Remedies to Mineral Cotenancy Disputes in Texas,* 50 Tex. Tech. L. Rev. 173, 175 (2017)

[23] *See* 4 EUGENE KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS § 51.2 (1990).

reputation for "honesty" and "reliability" in the industry.[24] Thus far, the record reflects that Courson is an established oil and gas field operator that has been in business since 1961. *See* Bloomberg, Company Profile: Courson Oil & Gas, Inc., https://www.bloomberg.com/profile/company/0709678D:US (last visited Mar. 20, 2020). Courson currently operates 288 producing oil and gas wells in the Texas Panhandle that collective yield an estimated average of 1,532 barrels of oil and 14,221 million cubic feet of gas every day. *See* Shale XP, Oil & Gas Data Visualization and Research: Courson Oil & Gas, Inc., https://www.shalexp.com/courson-oil-gas-inc (last visited Mar. 19, 2020). Seven of those wells are located in the same county as Section 157. *See id.* Based on the materials submitted to the Court, Courson would not bring any new non-cost bearing interests to Section 157.

By the Court's analysis, just one of the aforementioned factors weighs decisively in the Plaintiff's favor: Courson is a direct *competitor* to Latigo, the operator owned in part by Plaintiff and Plaintiff's preferred assignee to the Alpar Lease on Section 157. *See* Cryder & Larkin, *Consent Provisions in Natural Resources Agreements*, 30 Energy & Min. L. Inst. at 95-96. But the Court notes that no federal or state court yet appears to have adopted this "competitor" factor when undertaking "reasonableness" analysis in a consent-to-assign case — notwithstanding one oblique reference appearing in a footnote to Justice Guzman's concurrence in *Barrow-Shaver*. *See* 590 S.W.3d at 511 & n. 36. This Court hesitates to be the *first* court to apply this factor with decisive force in a case arising under Texas law.[25]

---

[24] This Court notes that Plaintiff's witness at the motion hearing suggested that Courson acted dishonestly or otherwise in bad faith when it purchased a separate interest from Plaintiff for $300,000 and shortly thereafter sold only the water rights to the land to the City of Amarillo for $400,000. However, the Texas Supreme Court has held that no general duty of good faith and fair dealing exists in Texas. *See Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225 (Tex. 2002) (duty of good faith and fair dealing not recognized except for when contract creates or governs special relationship between parties).

[25] Even if this Court were less hesitant to apply the "competitor" factor, Plaintiff's inability to marshal decisive evidence on the remaining six factors suggests that Plaintiff has not proved "reasonableness" under the totality of factors reflected in the assembled restatements, treatises, and law reviews.

In sum, Plaintiff presented solid briefing and cogent argument in support of a "case of first impression" thesis, but failed to allege the facts necessary to "tip the scales" under the relevant factors and PI standards. Because Paragraph 7 of the Alpar Lease as modified by the Third Amendment creates a valid promissory restraint on alienation, but Plaintiff failed to prove it had exercised said restraint in a *reasonable* manner, the Court FINDS that Plaintiff is not substantially likely to prevail on the first factor of the *Winter* test.

**2. Irreparable harm**

For the jurisprudential and logical reasons noted above, Plaintiff's failure to meet its burden under the first *Winter* factor is fatal to the Motion for PI. Even if Plaintiff *had* demonstrated a substantial likelihood to prevail on the merits, Plaintiff still would need to show that the assignment of Defendant's interest in Section 157 would cause Plaintiff (1) specific; (2) future; and (3) irreparable injury unless the Court were to grant the preliminary injunction. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 107 (1983). The "irreparable harm" factor is perhaps the most important of the four elements that the Court must consider when adjudging a motion for a preliminary injunction, *see* 11A WRIGHT & MILLER, FED. PRAC. & PROC. CIV. § 2948.1 (3d ed. 2019), but Plaintiff has failed to demonstrate to the Court's satisfaction that it will suffer the required harm absent the extraordinary and drastic relief of a preliminary injunction.

First, Plaintiff has not alleged anywhere in its briefing that it will suffer any *specific* injury unless the Court preliminarily enjoins assignment of Defendant's lease interest in Section 157 to Courson. Instead, Plaintiff has merely *speculated* about how Courson *might* injure its interests in Section 157 — in its briefing and through a live witness who twice used the word "speculation" to define the harm. *See Holland v. America Ins. Co. v. Succession of Roy*, 77 F.2d 992, 997 (5th Cir. 1985) (holding that speculative fears are not enough to prove irreparable harm).

Second, Plaintiff's reference to *past* injuries — namely, injuries alleged or adjudicated in Texas state courts — do not constitute the type of ongoing or probable future injuries requiring preliminary injunction. *See* Complaint ¶¶ 18-19, at 6-7.[26]

Third, Plaintiff alleges that it presently is losing tens of thousands of dollars a month due to Courson's adverseness to Plaintiff's current operators, but it only proffers naked assertions that damages it may suffer before the case is decided on its merits are "irreparable." Even if Courson as assignee to Section 157 were to cheat Plaintiff on royalties, strip mine the surface, and negligently permit all well heads to rust into dust, Plaintiff would have multiple causes for damages that it could bring against Courson to be made whole for violation of assorted implied covenants in Texas oil and gas leases.[27] Plaintiff has correctly agreed with Defendant that it also would accrue an action in damages against Defendant if Defendant wrongly assigns its interest in Section 157 to Courson. *See* Plaintiff's Reply Brief in Support of Motion for Preliminary Injunction 5, filed March 2, 2020 (ECF No. 13); *see also Palmer v. Liles,* 677 S.W.2d 661, 665 (Tex. Civ. App. - Houston 1984). And during the motion hearing, the witness for the Plaintiff testified that he could not identify any noneconomic harms that Plaintiff might suffer from assignment of Defendant's lease interest to Courson.

---

[26] The Court notes that Plaintiff and Courson have a litigious history in the Texas state courts. For example, Plaintiff in 2015 sued Courson under the theory that Paragraph 5 of the Alpar Lease entitled Plaintiff during the secondary term of the lease to terminate Courson's interest in individual leased production units as those *individual units* ceased to produce for sixty days —regardless of whether Courson continued to drill wells on undeveloped acreage. *See Mayo Foundation for Medical Education v. Courson Oil & Gas, Inc.,* 505 S.W.3d 68, 70 (Tex. Ct. App. Amarillo 2016). In contrast, Courson read Paragraph 5 of the lease to be much less severe, allowing Courson 180 days to cease production and even to bank up time credits. *See* 505 S.W.3d at 71. The Texas district court and the Texas court of appeals both agreed that Courson's interpretation was the "only reasonable construction of the lease" and that Courson therefore was entitled to summary judgment against Plaintiff. 505 S.W.3d at 73.

[27] For the general and long-established right to pursue damages against an oil and gas lessee, see *General Crude Oil Co. v. Harris,* 101 S.W.2d 1098 (Tex. Civ. App. Texarkana 1937). *See also* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 8.3 (2000). For the right to pursue damages for failure to diligently and properly develop and operate an oil or gas leasehold, see *Rathborne Land Co., L.L.C. v. Ascent Energy, Inc.,* 610 F.3d 249 (5th Cir. 2010). For the right to pursue damages for failure to sustain production levels, see *Hydrocarbon Management, Inc. v. Tracker Exploration, Inc.,* 861 S.W.2d 427 (Tex. App. Amarillo 1993).

Because Plaintiff has failed to provide convincing evidence of "irreparable harm," Plaintiff fails to satisfy the second *Winter* factor for preliminary injunction. Combined with Plaintiff's failure to demonstrate a likelihood of success on the merits, it therefore constitutes a second fatal blow to the Motion for PI. Neither party addresses the final two *Winter* factors — "balance of harms" or "public policy" — but the Court need not here *sua sponte* consider the issues because of Plaintiff's lack of success on the first two elements.

Consequently, for the aforementioned reasons, the Court DENIES Plaintiff's motion for a preliminary injunction without prejudice to Plaintiff's ability to continue to prosecute its underlying case against Defendant.

**SO ORDERED.**

March 20, 2020

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE